IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DR. SHERI L. KLOUDA,              §
                                 §
          Plaintiff,             §
                                 §
VS.                              §    NO. 4:07-CV-161-A
                                 §
SOUTHWESTERN BAPTIST             §
THEOLOGICAL SEMINARY, ET AL.,    §
                                 §
          Defendants.            §

MEMORANDUM OPINION
and
ORDER

After having considered the motions for summary judgment of
defendants, Southwestern Baptist Theological Seminary
("Seminary") and Leighton Paige Patterson ("Patterson"), the
response of plaintiff, Sherri L. Klouda, thereto, defendants'
replies, the entire summary judgment record, and pertinent legal
authorities, the court has concluded that the motions should be
granted, and that all plaintiff's alleged causes of action should
be dismissed.

I.

## Causes of Action Alleged by Plaintiff

Plaintiff's current pleading is her second amended complaint.  In summary, her allegations are that:

Plaintiff became associated with Seminary in the year 2000 when she was employed as a teaching fellow in its School of Theology, a position in which she served until 2002 when she was elected to the faculty of Seminary by its Board of Trustees as an assistant professor of Old Testament languages.  As an assistant professor, she was on a tenure-track position.  Plaintiff was the only female to teach at the School of Theology.  She was led to believe that her employment with Seminary would be renewed on a yearly basis based on her performance.  While employed at Seminary, plaintiff exhibited professional excellence at all times.  Her duties did not teach or spread faith.  She was not a minister, nor was she involved in church governance.

In June 2003 Seminary hired Patterson as its president.  In September 2003 plaintiff met personally with Patterson, who assured her that his appointment would not jeopardize her position.  In April 2006 plaintiff was informed by Seminary that "her contract was terminated, effective December 31, 2006." Second Am. Compl. at 7.  Patterson told plaintiff that his reason for not renewing her contract and for not recommending her for tenure was that she was a woman.  She was told that she was a mistake that the trustees needed to fix.  The chair of Seminary's Board of Trustees later informed a local newspaper that hiring a

woman to teach men was a "momentary lax of the parameters." <u>Id.</u> at 8.  Plaintiff left Seminary on August 1, 2006, after obtaining a teaching position at another university.

Patterson's decision to cause plaintiff's employment with Seminary to be terminated was based upon his social and/or personal beliefs; and, he used religion as a pretext for non-renewal of her employment and failure to recommend her for tenure.

Plaintiff's first cause of action is for breach of contract. She contends that she and defendants entered into an oral contract that her employment would be renewed on a yearly basis in the event her performance evaluations warranted a renewal. She attained that type of employment status by virtue of her election as a tenure-track professor.  Although she performed her obligations under the contract, her contract was not renewed, nor was she recommended for tenure, with the result that defendants breached the contract to her damage.

Fraud and/or fraud in the inducement are alleged as plaintiff's second cause of action.  Plaintiff says that she received representations and assurances both from Seminary, through its Board of Trustees, in April 2002 and from Patterson in their September 2003 meeting that she had a tenure-track position with Seminary and that she would continue to have that position so long as her performance met certain standards.  She made certain changes in her life based on those representations. The representations proved to be false, to her damage.

3

The third alleged cause of action is promissory estoppel and/or equitable estoppel. Plaintiff alleges that the promises made by defendants to her relative to the status of her employment cause Seminary to be estopped from using a change in Patterson's policy as an excuse to fail to renew her contract or recommend her for tenure.

Plaintiff describes her fourth cause of action as one for declaratory judgment. The court does not read this "cause of action" as adding anything to the others. Therefore, it will not be described further.

The fifth alleged cause of action is for defamation. She claims that Patterson labeled her a "mistake" and that the statement by the chair of Seminary's Board of Trustees to the newspaper that hiring a woman to teach men was a "momentary lax of parameters" constituted maliciously made defamatory statements that caused her to suffer damages.

Plaintiff's sixth alleged cause of action is sex discrimination based on the provisions of Title VII of the Civil Rights Act of 1964, as amended. According to plaintiff, Seminary, itself and by and through its agents, discriminated against her in violation of 42 U.S.C. § 2000e(2)(a) on the basis of sex, with malice or with reckless indifference to the protected rights of plaintiff.

Plaintiff describes in her pleading as her seventh cause of action "CONSTRUCTIVE DISCHARGE." Id. at 14. The court does not interpret this so-called cause of action as being anything other

than an element of one or more of her other causes of action. She alleges that Seminary, itself and through its agents, made the working conditions so intolerable that plaintiff felt compelled to resign her position.

Plaintiff prays for recovery of actual and exemplary damages, declaratory relief, pre-judgment interest, reasonable attorneys' fees, post-judgment interest, and costs of suit.

II.

Defendants' Motions and Plaintiff's Response

A.   The Motions.

Defendants' separate motions for summary judgment and supporting briefs and appendices are virtually identical.  The principal ground of the motions, which are directed to all of plaintiff's alleged causes of action, is that the causes of action, directly or indirectly, challenge an ecclesiastical decision that is protected by the church autonomy doctrine under the First Amendment to the United States Constitution, with the consequence that either the court does not have subject matter jurisdiction over the case or all of plaintiff's claims are barred by the First Amendment religion clauses.  An ingredient of that ground is defendants' contention that Seminary's relationship with its faculty, including plaintiff, has the legal status of the relationship of a church to its ministers, with the result that defendants' decisions regarding that relationship are per se ecclesiastical in nature.

As to the breach of contract, fraud, fraud in the inducement, and promissory estoppel claims, defendants alternatively maintain that the facts do not support all elements

of any of those claims.  Patterson adds that, in any event, he cannot be held responsible for any conduct of Seminary before he was elected president.  Defendants also assert that plaintiff's claims of estoppel are not causes of action under Texas law. They seek dismissal of the defamation cause of action on the further ground that plaintiff cannot show that any language was used that is capable of a defamatory meaning.  Patterson adds that, in any event, the language that was used was an expression of an ecclesiastical opinion that cannot be proved true or false.

According to defendants, the sex discrimination cause of action must be dismissed for the further reason that it is barred by limitations.  A sex discrimination claim under Title VII must be filed within 300 days after the alleged unlawful employment practice occurred.  The 300-day period starts to run from the date when the discriminatory act complained of comes to the attention of the employee.  If a claim of discrimination is not filed within 300 days of that date, it is barred by limitations. Defendants maintain that plaintiff was informed no later than June 22, 2004, that she would not be recommended for tenure within the School of Theology because of Patterson's decision that she was not qualified by reason of her gender.  Plaintiff's claim is barred because she did not file her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") until February 7, 2007, more than 300 days after the alleged discriminatory conduct occurred.

The identical appendices filed by defendants in support of
the motions for summary judgment contain as exhibits the
affidavits of Patterson, Craig A. Blaising ("Blaising") (the
Executive Vice President and Provost of Seminary), B. Paul Wolfe
("Wolfe") (the Assistant Dean of Biblical Studies of Seminary),
and T. Van McClain ("McClain") (the Chairman of the Board of
Trustees of Seminary), and twenty-one other exhibits, which are
authenticated by the affidavits. The exhibits include the
charter, articles of incorporation, bylaws, versions of the
faculty manual, excerpts of course catalogs, and minutes of
meetings of the Board of Trustees of Seminary.

B.    Plaintiff's Response[1]

Plaintiff responded that the church autonomy doctrine does
not apply to protect defendants from the conduct about which she
complains. She questions whether the decision made by defendants
relative to her employment status was religiously motivated; and,
she maintains that a fact issue exists as to that subject. In
addition, she maintains that, even if Patterson's decision was
religiously motivated, his alleged beliefs should not be
attributed to Seminary. And, she maintains that she was not a
minister, or, at least, there is conflicting evidence as to
whether she was, thus causing there to be a material fact in

---

[1]Plaintiff includes in her response objections to certain of the
summary judgment evidence provided by defendants. The court is not
ruling on those objections, but making known that it is giving the
summary evidence to which objection is made only such weight as is
appropriate.

dispute if the decisions were determined to be religiously motivated.

Plaintiff asserts, alternatively, that, even if the employment decision made by defendants was based on a sincerely held religious belief, a balancing test is must be applied to determine whether defendants are to receive First Amendment protection; and, she maintains that the balance would favor her position.

She maintains that there is summary judgment evidence raising an issue of fact as to each of the essential elements of each of her claims. She further responds as to her Title VII claim that her filing with the EEOC was timely. She says that the summary judgment evidence establishes that defendants did not

make the decision to terminate her employment until April 2006 and that she filed her claim within 300 days thereafter.

The evidentiary support for her response, provided in her appendix, includes the affidavit of plaintiff, a number of documents verified by plaintiff's affidavit, and excerpts from oral depositions of Patterson, Wolfe, and plaintiff.[2]

III.

## Applicable Summary Judgment Principles

A party is entitled to summary judgment on all or any part of a claim as to which there is no genuine issue of material fact and as to which the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 256. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-25 (1986). Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.

---

[2]Certain of the documents contained in plaintiff's appendix are identical to those provided by defendants in their appendices except for differences in the emphasis added.

574, 586 (1986).  The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 248, 256.  To meet this burden, the nonmovant must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]."  <u>Forsyth v. Barr</u>, 19 F.3d 1527, 1537 (5th Cir. 1994).  An issue is material only if its resolution could affect the outcome of the action.  <u>Anderson</u>, 477 U.S. at 248.  Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment.  <u>Simmons v. Lyons</u>, 746 F.2d 265, 269 (5th Cir. 1984).

The standard for granting a motion for summary judgment is the same as the standard for rendering judgment as a matter of law.  <u>Celotex Corp.</u>, 477 U.S. at 323.  If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.  <u>Matsushita</u>, 475 U.S. at 597.  <u>See also</u> <u>Boeing Co. v. Shipman</u>, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc) (explaining the standard to be applied in determining whether the court should enter judgment on motions for directed verdict or for judgment notwithstanding the verdict).

## Facts Established as a Matter of Law
## by the Summary Judgment Record

Uncontroverted summary judgment evidence establishes the following facts:

Seminary is a non-profit corporation with only one member, the Southern Baptist Convention ("Convention"). A Board of Trustees, elected by Convention, governs Seminary. Convention is a religious non-profit corporation. Seminary is fostered and supported by Convention, and is subject to the spiritual control and leadership of Convention. The activities of Seminary are guided by, and subject to, the articles of faith embraced by Convention. Members of Seminary's Board of Trustees are chosen from the membership of churches cooperating with Convention, elected by Convention, and subject to removal by Convention.

The purpose of Convention is to provide a general organization for Baptists in the United States and its territories for the promotion of Christian missions at home and abroad and other objects, such as Christian education, benevolent enterprises, and social services that Convention may deem proper and advisable in the furtherance of its religious objectives.

Seminary is one of six theological seminaries of Convention. The purpose and activities of each seminary is generally described in Seminary's faculty manual as follows:

### Mission

Southern Baptist Theological Seminaries exist to prepare
God-called men and women for vocational service in
Baptist churches and in other Christian ministries

throughout the world through programs of spiritual
development, theological studies, and practical
preparation in ministry.

Ministries

1.  Assist churches by programs of pre-
    baccalaureate and baccalaureate theological
    education for ministers. . . .

2.  Assist churches by programs of Master's level
    theological education for ministers. . . .

3.  Assist churches by programs of professional
    doctoral education for ministers. . . .

4.  Assist churches by programs of research
    doctoral education for minsters and
    theological educators . . . .

> 5. Assist churches through the administration of the Southern Baptist Historical Library and Archives.

Seminary App., Tab 6 at 197. The bylaws of Seminary state that Seminary's primary purpose is "to provide theological education for individuals engaging in Christian ministry." <u>Id.</u>, Tab 3 at 32. From time to time Convention has published a summary of the teachings that Baptists believe, which is titled <u>Baptist Faith and Message</u>, the most recent of which was adopted by Convention in 2000.

Included in the bylaws of Seminary is the following statement of Seminary's policy as to the relationship between Seminary and its faculty:

> It shall be the policy of the Seminary to strive for and maintain a faculty composed of persons dedicated to prayer and Bible study and who hold faithful allegiance to the Seminary's Statement of Faith as described in Article I.3 of these bylaws. Included are those who are of unquestionable Christian character, exhibit positive and consecrated Christian attitudes, strive to achieve the highest possible scholastic attainments, and demonstrate an acceptable aptitude for teaching. <u>The selection, election, promotion, granting of tenure, and termination of faculty members are viewed as matters of ecclesiastical concern and as commitments of faith between the Seminary and faculty members. Ecclesiastical concern requires that the relationship</u>

> not be entered into, continued, or severed without
> prayerful consideration.

Id., Tab 4 at 137 (emphasis added). With respect to the term of
employment of non-tenured faculty members, such as plaintiff, the
bylaws state:

> The employment of a faculty member with tenure continues
> on an indefinite basis,-according to provisions set
> forth in these bylaws. The Seminary is not obligated to renew a non-te

Id. at 143. Further on the subject of the term of employment of a
non-tenured faculty member, the 2005 Faculty Manual provides that
"[a] tenure-track faculty member may be dismissed if, in the
exercise by the Seminary of its sole discretion over matters of
ecclesiastical concern it determines . . . that it is not in the
best interests of the mission of the Seminary to continue the
employment." Id., Tab 6 at 194.

Seminary's School of Theology, of which plaintiff was a
faculty member, is one of four schools providing post-graduate
education on the main campus of the seminary. The purpose of the
School of Theology is described in Seminary's catalog as follows:

> The purpose of the School of Theology of Southwestern
> Baptist Theological Seminary is to provide graduate
> theological education for students engaging in Christian
> ministry. The curriculum is composed of basic biblical,
> theological, and ministry disciplines, designed to
> prepare the student for effective pastoral ministry and
> other ministries of the church. The school seeks to
> create a context conducive to growth in Christian
> character and to provide training and resources for a
> lifetime of continuing theological study.

Id., Tab 7 at 223. A degree offered through the School of
Theology is the Master of Divinity, which is the basic program for
preparing students for the Christian ministry. Classes that were

taught by plaintiff as a faculty member are part of the core curriculum for the Master of Divinity program.

The purposes of Seminary are wholly sectarian. Seminary is strictly a religious institution that has as its goal preparing persons for Christian ministry.

In April 2002 plaintiff was elected to the faculty of Seminary's School of Theology as an assistant professor of Old Testament language, without tenure. Some of the members of the Board of Trustees of Seminary expressed concern over whether electing a woman to teach in the School of Theology was consistent with the part of the <u>Baptist Faith and Message</u> that states that "[w]hile both men and women are gifted for service in the church, the office of pastor is limited to men as qualified by scripture." <u>Id.</u>, Tab B at 12, ¶ 24. Plaintiff's election to the faculty was the result of a compromise between members of the Board of Trustees that resulted in placement of a limitation on her scope of employment to the teaching of Hebrew and Aramaic grammar, syntax, and exegesis. The compromise included an expression that the purpose of plaintiff's position was "to help students gain facility in the handling of the Hebrew and Aramaic text of the Old Testament." <u>Id.</u>, Tab 8 at 236. The courses plaintiff taught during her employment as a non-tenured member of the faculty were limited pursuant to the compromise. Even with the compromise, there were members of the Board of Trustees of Seminary who opposed her election to the faculty.

Plaintiff's employment at Seminary involved preparing her students for the ministry.  In her responses to a faculty questionnaire, she said that she enjoyed spending time with students and "helping them prepare for ministry."  Id., Tab 9 at 248.  In a letter she wrote to Blaising in October 2003, she explained how meetings she attended "were helpful in that they clarified the connection between trying to demonstrate how what we teach is relevant and moves towards accomplishing our goal of training students who will minister in church communities."  Id., Tab 10 at 257.  She went on to say that she plans to work on an essay that she hopes will explain "how learning biblical language is relevant for practical ministry."  Id.  In a Faculty Evaluation Addendum for the academic year 2003-04, she described her Spiritual Leadership as including ministering to students primarily by listening to them, saying that she meets with students regularly and as she learns of their challenging personal circumstances, she prays with them and for them.  Id., Tab 11 at 262.  In a Teaching Evaluation Supplement for the academic year 04-05, she explained certain aspects of her role as a teacher at Seminary, saying:

> I attempt to accommodate a broad range of students in my courses and meet their practical needs in terms of ministry preparation.  I tailored the Exegetical Method courses to focus on exegesis as prerequisite to sermon/teaching preparation in local church ministries. I attempted to emphasize the contributions that biblical language instruction make to proper biblical interpretation.

Id., Tab 12 at 277.

Consistent with plaintiff's perception of her role at
Seminary, the summary judgment record establishes that the faculty
of Seminary are hired, assigned, advanced, tenured, evaluated, and
terminated on predominantly religious criteria.  Seminary regards
its employment decisions as divinely guided assessments of each
employee's suitability for the position she will occupy in
relation to the students and as a representative of the
institution.  The courses taught by plaintiff at Seminary had
sectarian goals.

Patterson was elected president of Seminary on June 24, 2003.
After he became president, he informed members of the Board of
Trustees and Blaising that, after prayerful consideration of
scripture, he believed that the best way for Seminary to relate to
Convention and its churches would be to have all persons teaching
future pastors within the School of Theology be qualified to serve
as the pastor of a local church.  Such a belief necessarily meant
that plaintiff would not be qualified to continue service as a
member of the faculty of the School of Theology.  The members of
the Board of Trustees to whom Patterson conveyed his belief
approved of it.

Blaising met with plaintiff in March and June 2004 when, in
at least one of the meetings, he told plaintiff that Patterson had
decided that plaintiff should not be recommended for tenure.  At
that time, plaintiff started seeking other employment.  Blaising
assisted her by writing letters of recommendation on her behalf to
several other universities.  The message to plaintiff that she

would not be recommended for tenure was the equivalent of a notice to her that she was being discharged, and she understood that fact when she was told that she would not be recommended for tenure.

On August 12, 2004, plaintiff met with Wolfe, who was her immediate supervisor, concerning her employment situation. She informed him that she was considering legal action, and that she was certain of victory if she pursued that course. During that meeting plaintiff provided to Wolfe for his consideration a draft of a letter she prepared for possible delivery to Patterson. It contained the following wording:

> I would like to request that you reconsider your current decision to revoke my tenure status and refuse to recommend me for tenure to the board of trustees at Southwestern Baptist Theological Seminary when the time arrives for my tenure review, on the basis of my gender.
>
> . . . <u>While I understand your personal conviction and the conviction of some board members that the faculty role in the school of theology should be understood as pastoral, and that you feel that the seminary should model the structure of the local church</u>, I have and continue to make a significant contribution to the School of Theology in the area of biblical languages and believe that God placed me in this place of service. . . .

<u>Id.</u>, Tab 14 at 297 (emphasis added).

In August 2004 plaintiff met personally with Patterson, when he confirmed to her his decision that he would not recommend her for tenure within the School of Theology. He told her that he would allow her to maintain her employment for a reasonable time until she was able to find a new position at another institution. Patterson agreed that, if plaintiff was unable to find employment earlier, she could continue to work at Seminary through the spring

19

2007 semester in a reassigned position for the same salary and benefits she was receiving as a member of the faculty. In May 2006 Blaising, on behalf of Seminary, offered plaintiff the position of Associate Director of the Writing Center, with no reduction in pay or employee benefits. She did not accept that offer. Rather, on July 6, 2006, she gave Dr. Blaising her letter informing him of her resignation from the faculty at Seminary effective July 31, 2006, and advising him that she had been appointed to the faculty of Taylor University, Upland, Indiana, effective August 1, 2006.

On February 7, 2007, plaintiff filed a charge of sex discrimination against Seminary with the EEOC. In March 2007, plaintiff filed her original complaint by which this action was instituted.

V.

Analysis

A.   The First Amendment Issues.

The Fifth Circuit has decided a series of cases, starting with McClure v. Salvation Army, 460 F.2d 553 (5th Cir. 1972), and going through Starkman v. Evans, 198 F.3d 173 (5th Cir. 1999), that discuss the principles that are determinative of the contention of defendants that plaintiff's alleged causes of action should be resolved against her by reason of the religion clauses

of the First Amendment.[3]  A brief discussion of the pertinent
Fifth Circuit decisions explains why a ruling in favor of
defendants based on the First Amendment is compelled.

    1.   *McClure v. Salvation Army*, 460 F.2d 553 (5th
        Cir. 1972).

The issue in <u>McClure</u> was whether Title VII applies to the
employment relationship between a church and its minister.  The
parties apparently acknowledged that the employer, The Salvation
Army, was a church for First Amendment purposes and that the
plaintiff, McClure, who was serving as a secretary of a department
of The Salvation Army at the time of the alleged discriminatory
practice, was a minister of The Salvation Army for purposes of a
First Amendment analysis.  McClure's claim was that she was
discriminated against in her employment with The Salvation Army
because of her gender.

The Fifth Circuit defined the issue in <u>McClure</u> to be:  "Does
the application of the provisions of Title VII to the relationship
between The Salvation Army and Mrs. McClure (a church and its
minister) violate either of the Religion Clauses of the First
Amendment?"  <u>Id.</u> at 558.  After a careful review of controlling
holdings of the Supreme Court, the Fifth Circuit concluded that:

> [T]he application of the provisions of Title VII to the
> employment relationship existing between The Salvation
> Army and Mrs. McClure, a church and its minister would
> result in an encroachment by the State into an area of
> religious freedom which it is forbidden to enter by the

---

[3]"Congress shall make no law respecting an establishment of
religion, or prohibiting the free exercise thereof."  U.S. Const.
amend. I.

principles of the free exercise clause of the First
Amendment.

Id. at 560.  The court then, after evaluating whether a
construction of Title VII is fairly possible by which the
constitutional issue could be avoided, held that "Congress did not
intend, through the nonspecific wording of the applicable
provisions of Title VII, to regulate the employment relationship
between church and minister."  Id. at 560-61.[4]

> 2.  *Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir.
> 1974).

In Simpson the Fifth Circuit was faced with the questions of
who would preach from the pulpit of a church and who would occupy
the church parsonage.  The plaintiffs, a pastor and his wife,
brought a civil rights suit against North Mississippi Conference
of the United Methodist Church and various church officials and
parishioners for damages for his ouster from the church and the
church parsonage by church officials.[5]  The Conference and the
church officials and parishioners contended that the court lacked

---

[4]McClure has provided guidance to the courts of other
jurisdictions concerning the church-minister relation in a Title VII
action.  See, e.g., Alicea-Hernandez v. Catholic Bishop of Chicago,
320 F.3d 698, 702-03 (7th Cir. 2003); EEOC v. Catholic Univ. of Am.,
83 F.3d 455, 462-63 (D.C. Cir. 1996); Young v. N. Ill. Conference of
United Methodist Church, 21 F.3d 184, 185 (7th Cir. 1994); Scharon v.
St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir.
1991); Minker v. Baltimore Annual Conference of United Methodist
Church, 894 F.2d 1354, 1357 (D.C. Cir. 1990); Rayburn v. General
Conference of Seventh-Day Adventists, 772 F.2d 1164, 1168 (4th Cir.
1985) (recognizing that the "ministerial exception" to Title VII was
first articulated in McClure).

[5]There were other defendants against whom causes of action not
relevant to this memorandum opinion were asserted.

subject matter jurisdiction over the claims against them by reason of the First Amendment's religion clauses.

The Simpson district court treated a motion for summary judgment as a motion to dismiss for lack of subject matter jurisdiction, and dismissed the action as to the religious-oriented defendants. The Fifth Circuit introduced its analysis with what it viewed to be a given:

> Certainly a congregation's determination as to who shall preach from the church pulpit is at the very heart of the free exercise of religion, which plaintiffs would corrode with an overlay of civil rights legislation and other parts of the Constitution. The people of the United States conveyed no power to Congress to vest its courts with jurisdiction to settle purely ecclesiastical disputes.

Id. at 492 (emphasis added).

Affirming, the Fifth Circuit, in reliance on established Supreme Court precedent, explained:

> The First Amendment language that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." historically has stood for the strict prohibition of governmental interference in ecclesiastical matters. Only on rare occasions where there existed a compelling governmental interest in the regulation of public health, safety, and general welfare have the courts ventured into this protected area. Such incursions have been cautiously made so as not to interfere with the doctrinal beliefs and internal decisions of the religious society. Thus, the law is clear: civil courts are barred by the First Amendment from determining ecclesiastical questions. . . .
>
>  . . . .
>
>  . . . A "spirit of freedom for religious organizations, an independence from secular control or m[a]nipulation in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine" is reflected in the Supreme Court's decisions.

The interaction between the church and its pastor
is an integral part of church government.

Id. at 493 (citations omitted).

Simpson's characterization of his dismissal as pastor as
racial in nature was to no avail.  The Fifth Circuit responded
with the following language taken from Wisconsin v. Yoder, 406
U.S. 205 (1972):

The values underlying these two provisions [of the First
Amendment] relating to religion have been zealously
protected, sometimes even at the expense of other
interests of admittedly high social importance.

Simpson, 494 F.2d at 494.  And, the court added emphasis by
repeating the admonition of the Supreme Court in Thomas v.
Collins, 323 U.S. 516 (1945), that "[o]nly the gravest abuses,
endangering paramount interests, give occasion for permissible
limitation."  Simpson, 494 F.2d at 494.  The court concluded the
part of its opinion pertaining to the claims against the
religious-oriented defendants by stating a principle adhered to by
the Supreme Court that "civil courts are not an appropriate forum
for review of internal ecclesiastical decisions."  Id.

3.  *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310
(5th Cir. 1977).

The plaintiffs in Brown were black parents and their school-
age children complaining of the conduct of a private sectarian
school which refused to admit the children for the sole reason
that they were black.  The school took the position that the civil
rights statute upon which the action was based, 42 U.S.C. § 1981,
did not apply to the school because its decision not to enroll the
children constituted the exercise of religious belief protected by

24

the free exercise clause of the First Amendment.  The district
court, following a bench trial, found as a fact that the school's
discriminatory policy was based upon a social policy or philosophy
and was not a part of the exercise of religion.  The Fifth Circuit
concluded that the finding of the district judge was supported by
substantial evidence, saying that "it is clearly the duty of the
court to decide, as a matter of fact, whether or not any activity
constitutes the exercise of religion."  Id. at 313.

However, the court emphasized that it was not holding that a
belief must be permanently recorded in written form to be
religious in nature.  Id. at 312.  Of potential pertinence to the
instant action, the court made the following statement:

> [A] school or church which holds racial segregation as a
> religious tenet should not be barred from asserting a
> free exercise defense to a § 1981 claim merely because
> some of its patrons or members might individually
> believe racial segregation is morally wrong.

Id. at 314.

    4.  *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir.
        1980).

Mississippi College was a subpoena enforcement action on
appeal from the district court's denial of EEOC's petition seeking
enforcement of a subpoena issued in connection with EEOC's
investigation of a charge of discrimination against Mississippi
College.  The charge of discrimination was made by a female
teacher who claimed that the College had discriminated against her
on the basis of sex in hiring someone to fill a full-time position
in the psychology department in which she had been working part-
time as an assistant professor.  More generally, the charging

25

party complained that the College discriminated against women as a class with respect to job classifications, promotions, recruitment.[6]

An argument made by the College in resisting the subpoena was that the employment relationship between a religious educational institution and its faculty is exempt from Title VII, placing reliance on the court's holding in <u>McClure</u>. The court held that the College's reliance on <u>McClure</u> was misplaced, pointing out that in <u>McClure</u> the court expressly restricted its decision to the context of the church-minister relationship, and noting that the College is not a church and its faculty members are not ministers. <u>Id.</u> at 485. The court explained:

> The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern. The employment relationship between Mississippi College and its faculty and staff is one intended by Congress to be regulated by Title VII.

<u>Id.</u>

The court concluded that the establishment clause of the First Amendment did not prevent enforcement of the subpoena because the nature of the burden that might be imposed upon the College by the application of Title VII to the College was largely hypothetical at that stage of the proceedings. But, the court

---

[6]The charging party also contended that the College discriminated on the basis of race in recruiting and hiring.

went on to note that "[b]efore the EEOC could require the College to alter [the College's policy of hiring only men to teach courses in religion], the College would have an opportunity to litigate in a federal forum whether . . . the first amendment protects that particular practice." Id. at 487. The court "thus determine[d] that, in the factual context before [the court], the application of Title VII to the College could have only a minimal impact upon the College's religion based practices." Id.

Turning its attention to the free exercise clause, the court said that a determination of whether a statutory enactment violates the free exercise of a sincerely held religious belief involves an examination of:

> (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

Id. at 488. The court explained that "the relevant inquiry is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." Id. The court found that the College's employment practices subject to Title VII did not embody religious beliefs or practices, with the result that the impact of Title VII on the church's free exercise of religious beliefs was minimal. As to the second factor, the court noted that the government has a compelling interest in eradicating discrimination in all forms. Id. The court stated generally that "the application of Title VII

27

to educational institutions such as Mississippi College does not violate the free exercise clause of the first amendment." Id. at 489.

Included in the summarization of its holdings, the court reiterated that McClure "exempts from the coverage of Title VII only the relationship between a church and its minister and does not apply to the relationship between a religious educational institution and its faculty." Id. However, it made the points throughout its opinion that its decision was being made in the context of a subpoena enforcement action and did not determine whether the College's policy of hiring only men to teach courses in religion violated Title VII, and that resolution of that issue would await a future action specifically directed against the policy. Id. at 487-88.

5. EEOC v. Southwestern Baptist Theological Seminary, 651 F.2d 277 (5th Cir. Unit A 1981).

Southwestern involved one of the defendants in the instant action, Seminary, and issues similar to those raised in this action. EEOC sought by the action to compel Seminary to file requested forms. EEOC appealed from the district court's refusal to compel Seminary to file the forms.

The court said that it was required "to balance the interest of the federal government in enforcing Title VII against the first amendment rights of a religious institution of higher learning." Id. at 279. In the Facts section of the opinion, the court described Seminary essentially the same as defendants have described it by their summary judgment evidence. For decision

28

purposes, the court categorized Seminary's employees as faculty, administrative staff, and support personnel.  Id. at 279.

The Fifth Circuit recognized the similarity between Southwestern and Mississippi College as well as the factual distinctions, noting that in Mississippi College the evidence established that the character and purpose of the College were pervasively sectarian, whereas, in contrast, the character and purposes of Seminary are wholly sectarian.  Southwestern, 651 F.2d at 281.  The court considered that factual distinction important, saying "[t]his factual distinction is pertinent not only to the applicability of Mississippi College, but also to the test for excessive governmental entanglement."  Id.  With respect to the status of the members of Seminary's faculty, the court said:

> The Seminary's role is vital to the Southern Baptist
> Church. No one would argue that excessive intrusion into
> the process of calling ministers to serve a local church
> is constitutionally permissible. The Convention's hiring
> of faculty and other personnel to train ministers for
> local churches is equally central to the religious
> mission and entitled to no less protection under the
> first amendment.

Id. (emphasis added).[7]

The court concluded that the "rationale of McClure is fully applicable here."  Id. at 282.  In the course of reaching its conclusion that Seminary is entitled to the status of "church," the court explained:

> Clearly, the Seminary is an integral part of a church,
> essential to the paramount function of training
> ministers who will continue the faith. It is not

_____

[7]The other factual distinctions the court noted between Southwestern and Mississippi College are not relevant here.

intended to foster social or secular programs that may
entertain the faithful or evangelize the unbelieving.
Its purpose is to indoctrinate those who already
believe, who have received a divine call, and who have
expressed an intent to enter full-time ministry. The
local congregation that regularly meets in a house of
worship is not the only entity covered by our use of the
word "church." That much is clear from <u>McClure</u>. In the
Baptist denomination, the Convention is formed to serve
all participating local congregations. The fact that
those who choose to participate in the Convention do so
voluntarily renders it no less deserving of the
protection of <u>McClure</u>. Since the Seminary is principally
supported and wholly controlled by the Convention for
the avowed purpose of training ministers to serve the
Baptist denomination, it too is entitled to the status
of "church."

<u>Id.</u> at 283.

Also, the Fifth Circuit affirmed the district court's

conclusion that faculty members of Seminary are "ministers,"[8]

explaining:

The district court found that the Seminary makes
employment decisions regarding faculty members largely
on religious criteria. This finding is supported by the
record. As previously discussed, the level of personal
religious commitment of faculty members is considered
more important than their devotion to the Baptist church
or their academic abilities, though all of these
qualities are desirable. According to Dr. Dilday,
President of the Seminary, there is no course taught at
the Seminary that has a strictly secular purpose; Dr.
Naylor, the Seminary's President Emeritus, testified
similarly. Though the record indicates that ministers
are ordained by local churches and not by the Seminary,
most of the faculty have been ordained. The Seminary
expects the faculty to teach by example as well as by

---

[8]The district court found that members of the faculty and
administration of Seminary are considered ministers, and are hired,
assigned, advanced, tenured, evaluated, and terminated on
predominantly religious criteria, and that "Seminary regards its
employment decisions as divinely guided assessments of each employee's
suitability for the position he will occupy in relation to the
students and as a representative of the institution." <u>EEOC v.
Southwestern Baptist Theological Seminary</u>, 651 F.2d 277, 280 (5th Cir.
Unit A 1981).

other means. The faculty models the ministerial role for the students. Based on the district court's findings of fact, we conclude that the faculty at the Seminary fit the definition of ministers for the purpose of applying McClure.

.    .    .    .

. . . In this case, the faculty are intermediaries between the Convention and the future ministers of many local Baptist churches. They do instruct the seminarians in the whole of religious doctrine, and only religiously oriented courses are taught. Thus, the role of the faculty of the Seminary is different from that of Mississippi College's faculty. Candor compels acknowledgment, moreover, that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law. The line, though dimly perceived, is there. McClure establishes that Title VII does not apply to the employment relationship between this Seminary and its faculty. Given the unique role of the faculty of any school, they are afforded unique protection.

Id. at 283-84 (citations, footnotes, & quotation marks omitted).

The Fifth Circuit concluded that Seminary's support staff did not qualify as "ministers," that the evidence was not sufficient to support a conclusion that all of the administrative staff qualified as ministers; but, the court held that the President and Executive Vice President, the chaplain, the deans of men and women, the academic deans, and other personnel who equate to or supervise faculty should be considered ministers as well. Id. at 284-85. Those administrators who were not to be treated as ministers for First Amendment purposes were those "whose function relates exclusively to the Seminary's finance, maintenance, and other non-academic departments." Id. at 285. The court explained that "[w]hen churches expand their operations beyond the traditional functions essential to the propagation of their

31

doctrine, those employed to perform tasks which are not traditionally ecclesiastical or religious are not 'ministers' of a 'church' entitled to <u>McClure</u>-type protection."  <u>Id.</u>

The effect of the court's holding in <u>Southwestern</u> was that, while EEOC could require Seminary to file report forms as to its support staff and administrative staff members who could not be characterized as ministers, EEOC was prohibited by the religion clauses of the First Amendment from requiring the filing of the report as to faculty and the members of the administrative staff who qualified as ministers.  <u>Id.</u> at 286-87.[9]

     6.   <u>Combs v. Central Tex. Annual Conference of the United Methodist Church</u>, 173 F.3d 343 (5th Cir. 1999).

<u>Combs</u> was an action against First United Methodist Church of Hurst and the Central Texas Annual Conference of the United Methodist Church by a pastor of the church complaining of employment discrimination.  After her appointment by the Central Conference to serve as minister of the Church, she became pregnant, and was granted maternity leave, during which she suffered serious post-partum complications, which required extensive medical care and rest.  During her period of incapacitation, her supervisors challenged her competence,

_____

[9]The Fifth Circuit is not alone in concluding that Seminary is a "church."  An intermediate appellate court of Texas reached that same conclusion in <u>Patterson v. Southwestern Baptist Theological Seminary</u>, 858 S.W.2d 602, 605 (Tex. App.--Fort Worth 1993, no writ).  In <u>Patterson</u>, the court held that the courts could not delve into issues concerning matters pertaining to termination of a tenured professor and faculty member at Seminary because to do so would unconstitutionally involve the civil courts in the determination of matters that are ecclesiastical in nature.

performance, and honesty.  The Church then denied her the
maternity benefits she had been granted, and demanded that she
repay those benefits.  When she returned to work she was told by a
superior that she had been terminated.

In response to Combs's suit, the Central Conference moved for
summary judgment that the decision to terminate her was shielded
from governmental review by the free exercise clause of the First
Amendment.  The Church filed a motion to dismiss predicated on the
same theory.  The district court granted both motions, and
dismissed the suit, holding that the First Amendment prohibited
civil review of the decisions of the defendants to terminate Combs
and that, therefore, the district court lacked jurisdiction over
the case.

The Fifth Circuit affirmed, stating in conclusion that:

> This case involves the interrelationship between two
> important governmental directives--the congressional
> mandate to eliminate discrimination in the workplace and
> the constitutional mandate to preserve the separation of
> church and state. As this Court previously observed in
> McClure, both of these mandates cannot always be
> followed. In such circumstances, the constitutional
> mandate must override the mandate that is merely
> congressional.

173 F.3d at 351.  That conclusion followed logically from the
principle stated in the opinion that "churches must be free to
decide for themselves, free from state interference, matters of
church government as well as those of faith and doctrine" (id. at
350 (quotation marks omitted)) and the court's observation that:

> [W]e cannot conceive how the federal judiciary could
> determine whether an employment decision concerning a
> minister was based on legitimate or illegitimate grounds
> without inserting ourselves into a realm where the

33

Constitution forbids us to tread, the internal
management of a church.

Id.

    7.   Starkman v. Evans, 198 F.3d 173 (5th Cir. 1999).

Starkman was an action under the Americans with Disabilities
Act, 42 U.S.C. § 12101 et seq., and a state retaliatory act.
Starkman's position with the defendant, Munholland United
Methodist Church, was as choir director.  The district court
granted summary judgment as to Starkman's federal claims, holding
that her position as a choir director was within the parameters of
the Fifth Circuit's First Amendment "ministerial exception" in
employment discrimination cases.  198 F.3d at 174.

In the light of the earlier holdings of the court in McClure
and Combs, the court viewed the determinative factor to be whether
Starkman qualified as a "minister" within the meaning of the rule
applied in those cases.  The court explained that:

> Ms. Starkman's position as a choir director required her
> to perform ministerial functions that warrant the First
> Amendment's protections against undue interference with
> the personnel decisions of churches and religious
> leaders.
>
>     If Ms. Starkman is considered a "minister" and
> falls under the exception, this Court may not inquire
> into her employment and must dismiss her suit against
> the Church. On the other hand, if Ms. Starkman's
> position as a choir director merely required her to
> "perform tasks which are not traditionally
> ecclesiastical or religious," the Church is not
> "entitled to McClure-type protection" under the Free
> Exercise clause.

Id. at 175.  The court made clear that the status of an employee
as a minister for purpose of McClure is not a fact issue to be

34

decided by a jury, but is a legal conclusion for the court.  Id.
at 176.

The court explained that "[t]he ministerial exception
encompasses all employees of a religious institution, whether
ordained or not, whose primary functions serve its spiritual and
pastoral mission." Id (quotation marks omitted).  In evaluating
whether an employee qualifies as a "minister" the court considered
as an important factor whether the job function performed by the
person played an important role in the spiritual mission of the
church.  Starkman's job satisfied that factor because the job's
specifications required her to be educated in religion and serve
as a spiritual leader.

A second factor to consider, the court said, is whether the
plaintiff was qualified and authorized to perform the ceremonies
of the Church.  That factor was satisfied because Starkman had
several religious duties and responsibilities.  Id.  The third
factor, which the court considered most important, is whether the
plaintiff engaged in activities traditionally considered
ecclesiastical or religious.  Id.  While Starkman claimed that
attending to the religious needs of the faithful was not a primary
duty, she admitted that she was designated to be a "ministerial
presence" to ailing parishioners on occasion, and she conceded
that, for her and her congregation, music constitutes a form of
prayer that is an integral part of worship services and Scripture
Readings." Id. at 177.  The court noted that Starkman's position
as choir director was not as weak as that of the faculties in

35

<u>Mississippi College</u>, and that it is not similar to the support staff, who only served mere administrative functions in <u>Southwestern</u>; and, the court found sufficient that "Starkman clearly performed tasks that were traditionally ecclesiastical or religious." <u>Id.</u> (quotation marks omitted).

The court affirmed the district court's summary judgment as to the ADA claim because "the facts of this case trigger the Free Exercise Clause's bar against such claims." <u>Id.</u>

\*       \*       \*       \*       \*       \*

As the cases discussed above disclose, the Fifth Circuit has, for the most part, warmly embraced the broad "ecclesiastical abstention doctrine" and the narrower "ministerial exception" in challenges to a religious institution's employment decisions.  As to the broader doctrine, the courts are prohibited by the First Amendment from involving themselves in ecclesiastical matters, such as disputes concerning theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required.  <u>See</u> <u>Watson v. Jones</u>, 80 U.S. (13 Wall.) 679, 733 (1871).

If the claim challenges a religious institution's employment decision, an important inquiry is whether the employee is a member of the clergy or otherwise serves a ministerial function.  If the answer is "yes," the "ministerial exception" applies, thus preventing court review of the employment decision without further question as to whether the claims are ecclesiastical in nature. <u>See</u> <u>Combs</u>, 173 F.3d at 350.  The court has concluded that a review

36

by this court of the employment decision of defendants concerning plaintiff's employment is prohibited by the ecclesiastical abstention doctrine as well as the ministerial exception.

The record clearly establishes that Seminary is a "church" and that plaintiff is a "minister" as contemplated by the ministerial exception doctrine. Moreover, the record establishes as a matter of law that the employment decision made by defendants concerning plaintiff was ecclesiastical in nature. If the court were to allow plaintiff's claims to go through the normal judicial processes, the procedural entanglements would be far-reaching in their impact upon Seminary as a religious organization. See Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir. 1985). The substantive implications of resolution by the courts of a dispute such as the one presented by the instant action would constitute an inappropriate state intrusion into an area where Seminary has a legitimate claim to autonomy in the elaboration and pursuit of its own beliefs and practices. Id. at 1170-71.

Even if there were basis in the summary judgment record for argument that Patterson did not make his employment decision as to plaintiff as rapidly as might have been expected, or that there are others associated with Seminary who might not believe as strongly as Patterson, if at all, that the doctrines to which Patterson adheres required plaintiff's termination, or that Seminary and Patterson engaged in conduct inconsistent with the doctrinal beliefs that led to plaintiff's termination, mere

inquiry into those areas would be an unconstitutional intrusion into the affairs of Seminary as a religious organization.

The court is satisfied from the summary judgment record that the decision of Patterson and members of Seminary's Board of Trustees to terminate plaintiff was religiously motivated. No rational finder of fact could make a finding to the contrary. The employment decision was the product of a sincerely held religious belief on the part of Patterson and members of the Board of Trustees; and, the summary judgment record so strongly supports such a finding that no reasonable finder of fact could find otherwise. There is no counterbalance that would outweigh the interest evidenced by the First Amendment in protecting the sanctity of the decision-making of defendants that resulted in the termination of plaintiff's employment. Seminary must be free to decide for itself, free of interference of the courts, matters

of church governance, such as the identities of those who will be permitted to teach courses in the preparation of students for church ministry.  As the Fifth Circuit noted in <u>Combs</u>, it is impossible to "conceive how the federal judiciary could determine whether an employment decision concerning a minister was based on legitimate or illegitimate grounds without inserting [itself] into a realm where the Constitution forbids [it] to tread, the internal management of a church."  173 F.3d at 350.

The only First Amendment issue presented in this case that does not appear to have been definitively resolved by the Fifth Circuit is the breadth of the First Amendment protection provided defendants as to plaintiff's causes of action.  Clearly, the Title VII cause of action cannot be pursued by plaintiff.  The court has concluded that the First Amendment protection should be extended to all of the alleged causes of action.  A case in point, which is a non-Title VII case, is <u>Ogle v. Church of God</u>, 153 F. App'x 371 (6th Cir. 2005).  <u>Ogle</u> was a suit against the Church of God in which the plaintiffs asserted claims of breach of implied contract, tortious interference with business relationships, invasion of privacy, conspiracy, intentional infliction of emotional distress, defamation, and loss of

consortium (a claim in which Ogle's wife joined).  Id. at 371.
The district court dismissed all of the claims for lack of subject
matter jurisdiction because they all arose out of Ogle's
experiences with the Church's disciplinary process.  The court
concluded that the exercise clause of the First Amendment
prohibited involvement by the court into the disputes between the
plaintiffs and the Church.  The court explained why all of the
claims should be dismissed as follows:

> The district court was correct in holding that "upon a
> review of the record, including the pleadings and
> evidence submitted by the parties, it is clear that
> regardless of how the claims set forth in the
> plaintiffs' complaint may be labeled, resolving the
> plaintiffs' claims would require[ ] this court to enter
> into areas implicating the First Amendment."  Ogle's
> claims of breach of implied contract, tortious
> interference with business relationships, conspiracy,
> invasion of privacy, and defamation, as well as his
> request for a declaratory judgment that the charging
> body within the Church of God lacked the legal or other
> proper authority to bring charges against him, all
> implicate the Church of God's internal disciplinary
> proceedings. As a result, this court cannot have subject
> matter jurisdiction over them. The district court was
> also correct in holding that Ogle's intentional
> infliction of emotional distress, loss of consortium,
> and punitive damages claims are derivative of the other
> claims. Therefore, the court's lack of subject matter
> jurisdiction over the primary claims necessarily results
> in lack of jurisdiction over the secondary claims.

Id. at 375-76.

The court finds persuasive the reasoning of the Sixth
Circuit.  In the instant action, all claims asserted by plaintiff
against defendants are derivative of or intimately related to the
employment action taken against her by defendants.  Therefore,

defendants enjoy First Amendment protection to all of the claims.[10]

For the reasons given above, the court has concluded that all claims of plaintiff should be dismissed on First Amendment grounds.

B.   Other Reasons Why Plaintiff's Alleged Causes of Action are not Viable.

In the interest of completeness, the court is devoting brief attention to alternative grounds alleged in defendants' motions as to why plaintiff's alleged causes of action should be dismissed.

1.   The Breach of Contract Cause of Action.

The court has concluded that no reasonable fact finder would conclude that Seminary entered into an employment contract with plaintiff that was breached by the employment decision that caused her to resign.  Seminary's bylaws stated that it is "not obligated to renew a non-tenured faculty member's employment," supra at 15. The Faculty Manual provided that a faculty member is subject to dismissal "in the exercise by the Seminary of its sole discretion over matters of ecclesiastical concern [if] it determines . . .

_____

[10]A similar result was reached by a Texas intermediate appellate court in Patton v. Jones, 212 S.W.3d 541, 555 (Tex. App.--Austin 2006, pet. denied).  In Patton, the plaintiff's employment as director of youth ministries of a Methodist church was terminated.  He sued for tortious interference and defamation against the church and church-related defendants.  The court held that all his claims were barred by the First Amendment, stating that the claims were properly dismissed "because they arose from actions taken and communications made in connection with the Church's decision to terminate Patton from a 'ministerial' position, and the First Amendment prohibits secular review of a church's employment decisions about its ministers."  Id. at 555.

that it is not in the best interest of the mission of the Seminary to continue the employment."  Id.

> 2.  The Fraud, Fraud in the Inducement, and Estoppel Causes of Action.

There simply is no evidence in the summary judgment record from which a reasonable finder of fact could find that either of the defendants engaged in any fraudulent conduct toward plaintiff. For the reasons stated under the immediately preceding heading, the written rules governing her tenure of employment made clear to her that she, for all practical purposes, was subject to termination whenever there was a decision by the Seminary or its controlling authority that it was not in the best interests of the mission of the Seminary to continue the employment.  There is no summary judgment evidence that would allow a fact finder to find that she would be justified in disregarding what the Faculty Manual so clearly stated.

> 3.  Defamation Cause of Action.

This cause of action is based on a statement plaintiff says Patterson made to her that she was a "mistake"[11] and the statement made by the chairman of Seminary's Board of Trustees to a newspaper reporter that hiring a woman to teach men was a "momentary lack of parameters."  Neither statement is subject to a meaning defamatory of plaintiff.  If either of the statements

---

[11]The supplemental appendix filed by Patterson with his reply has excerpts from the deposition of plaintiff to the effect that Patterson did not make the "mistake" comment but that it was made by Wolfe. Supplemental App. at 88-89.  No one but plaintiff and Wolfe were present when the comment was made.  Id. at 91.  So far as she knows, she is the one who published the comment to the media.  Id.

reflects badly on anyone, it would be defendants.  Moreover, there is no suggestion in the record that the "mistake" statement, if it was made, was published by anyone other than plaintiff to any third party.  For an oral statement to be actionable, it "must be communicated to a third party in such a way that the third party understands the words in a defamatory sense."  <u>Plumley v. Landmark Chevrolet, Inc.</u>, 122 F.3d 308, 311 (5th Cir. 1997).

    4.  <u>The Title VII Claim</u>.

    Plaintiff would be barred in any event from asserting her Title VII claim because she failed to comply with the requirement that she file a charge of discrimination within 300 days "after the alleged unlawful practice occurred."  42 U.S.C. § 2000e-5(e)(1); <u>EEOC v. WC&M Enters., Inc.</u>, 496 F.3d 393, 398 (5th Cir. 2007).  In this case, the discriminatory act was the decision conveyed to plaintiff at least twice in the late spring and summer of 2004 that she would not be recommended for tenure within the School of Theology.  Her Title VII claim is time-barred by reason of her failure to file it within the statutory time limit. <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 109 (2002).


VI.

<u>Conclusion and Order</u>

    For the reasons given above, the court concludes that defendants' motions for summary judgment should be granted. "[T]he pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Therefore,

The court ORDERS that all causes of action asserted by plaintiff in the above-captioned action be, and are hereby, dismissed.

SIGNED March 19, 2008.

    /s/ John McBryde
JOHN McBRYDE
United States District Judge